**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KYLE HAKKARAINEN,<br>    obo Natalie Blanton, | )<br>) | CASE NO. 1:10-cv-2463 |
| | )<br>) | JUDGE WELLS |
|     Plaintiff, | )<br>) | |
| | ) | MAGISTRATE JUDGE |
|     v. | )<br>) | VECCHIARELLI |
| MICHAEL J. ASTRUE,<br>    Commissioner of Social Security, | )<br>)<br>) | |
| | ) | |
|     Defendant. | ) | **REPORT AND RECOMMENDATION** |

        Plaintiff, Kyle Hakkarainen ("Kyle Hakkarainen" or "Plaintiff"), challenges the final

decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the

Commissioner"), denying the claimant, Natalie A. Blanton's ("the claimant") applications

for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act,

42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be REVERSED and this case REMANDED for

further proceedings consistent with this Report and Recommendation.

## I.  PROCEDURAL HISTORY

On November 10, 2004, the claimant protectively filed applications for a POD, DIB, and SSI and alleged a disability onset date of December 15, 2003.  (Tr. 16.)  Her applications were denied initially and upon reconsideration, so the claimant requested a hearing before an administrative law judge ("ALJ").  (Tr. 16.)  An ALJ held the claimant's hearing on April 10, 2008.  (Tr. 16.)  The claimant appeared, was represented by counsel, and testified.  (Tr. 16.)  A vocational expert ("VE") also appeared and testified.  (Tr. 16.)  On April 25, 2008, the ALJ found the claimant not disabled.  (Tr. 39.)  The Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 7.)

On April 17, 2009, the claimant passed away.  (Doc. No. 26-1.)  On October 28, 2010, Ann A. Blanton—the claimant's mother—filed a complaint on behalf of the claimant to challenge the Commissioner's final decision.  (Doc. No. 1.)  On April 18, 2011, the Commissioner filed a motion to dismiss the complaint for lack of standing.  (Doc. No. 13.)  On May 18, 2011, Ann A. Blanton responded to the Commissioner's motion to dismiss (Doc. No. 16) and filed a motion to amend her complaint (Doc. No. 17).  On June 20, 2011, the undersigned Magistrate Judge recommended that the Commissioner's motion to dismiss be granted with prejudice as to the claimant's claim for SSI and granted without prejudice as to the claimant's claim for POD and DIB; that Ann A. Blanton's motion to amend her complaint be denied; and that Ann A. Blanton be permitted to file a second motion to amended her complaint consistent with the Magistrate Judge's report and recommendation.  (Doc. No. 20.)  The presiding District Judge adopted the Magistrate Judge's recommendation.  (Doc. No. 21.)

2

On July 20, 2011, Ann A. Blanton filed a motion to amend her complaint to add Kyle Hakkarainen—the claimant's son—as a party plaintiff.  (Doc. No. 22.)  Also on July 20, 2011, Kyle Hakkarainen filed a motion to intervene.  (Doc. No. 23.)  On August 3, 2011, the Court granted Ann A. Blanton's and Kyle Hakkarainen's motions.  (Doc. No. 25.)  On August 16, 2011, Kyle Hakkarainen filed an amended complaint on behalf of the claimant to challenge the Commissioner's final decision.[1]  (Doc. No. 26.)

On October 18, 2011, Plaintiff Kyle Hakkarainen filed his Brief on the Merits. (Doc. No. 32.)  On December 8, 2011, the Commissioner filed his Brief on the Merits. (Doc. No. 35.)  Plaintiff did not file a Reply Brief.

Plaintiff asserts three assignments of error:  (1) the ALJ failed to deem the claimant's fibromyalgia a "severe impairment"; (2) the ALJ failed to determine whether the claimant's severe physical impairment met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 ("the Listings"); and (3) the ALJ failed to assess the opinions of the claimant's treating sources properly.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

The claimant was 32 years old on the alleged disability onset date (Tr. 36), and 37 years old at the time of her hearing (Tr. 1348).  She had at least a high school education and was able to communicate in English.  (Tr. 36.)  She had past relevant work experience as a carpenter.  (Tr. 36.)

―――――――――――――

[1] Ann A. Blanton did not file an amended complaint and is not named as a plaintiff in Kyle Hakkarainen's amended complaint.

3

**B.** **Medical Evidence**

**1.** **Physical Impairments**

Plaintiff's appeal of the Commissioner's final decision implicates only the claimant's fibromyalgia and rheumatoid arthritis; accordingly, the following medical history will relate only to those impairments.

On February 4, 2004, the claimant presented to rheumatologist David Mandel, M.D., upon referral from Dr. John Posch, M.D., for an evaluation of the claimant's complaints of pain in her hands, wrists, and knees.  (Tr. 306-07.)  Dr. Mandel assessed the possibility of early inflammatory arthropathy and started the claimant on Relafen. (Tr. 307.)

On February 13, 2004, the claimant presented to Dr. Mandel with complaints of pain and swelling in her right elbow.  (Tr. 348.)  Dr. Mandel assessed the claimant with active inflammatory arthritis; injected the thickening synovial tissue in her elbow with Solu-Medrol 40; started the claimant on Methotrexate; and gave the claimant a low dose of Prednisone as bridge therapy until the Methotrexate took effect.  (Tr. 348.)

On March 25, 2004, Dr. Mandel reported that the claimant had called his office and complained that she had been suffering overwhelming fatigue after taking Methotrexate.  (Tr. 361.)  Dr. Mandel indicated that the claimant's fatigue could be caused by her work activity and arthritis, as well as the medication, and instructed the claimant to reduce her dose of Methotrexate.  (Tr. 361.)

On April 8, 2004, the claimant returned to Dr. Mandel and continued to complain of fatigue, as well as muscle pain.  (Tr. 361.)  Dr. Mandel assessed the claimant with

4

inflammatory arthritis and "[s]trongly positive rheumatoid factors."  (Tr. 361.)  Dr. Mandel

started the claimant on Plaquenil and recommended that the claimant obtain pain

management therapy.  (Tr. 361.)

On April 26, 2004, Dr. David A. Demangone, M.D., authored a letter to Dr.

Mandel indicating the following.  (Tr. 362-63.)  The claimant had presented to Dr.

Demangone upon referral from Dr. Mandel for consultation on the claimant's multiple

joint pain.  (Tr. 363.)  The claimant suffered pain in her hands, knees, wrists, and

elbows.  (Tr. 363.)  The pain began the year before and "for no apparent reason."  (Tr.

363.)  Dr. Demangone's physical examination of the claimant was essentially normal.

(Tr. 363.)  Dr. Demangone indicated that he was of the opinion that the claimant

suffered "somatic pain, from an inflammatory arthritis condition, possibly rheumatoid

arthritis"; and that he hoped the claimant would continue to have satisfactory pain relief

with the use of pain medication.  (Tr. 363.)  The claimant continued to present to Dr.

Demangone through 2008, and on each occasion Dr. Demangone diagnosed the

claimant with rheumatoid arthritis.  (Tr. 380-87, 844-58.)

On July 2, 2004, Dr. Mandel completed a functional limitations form and

assessed the claimant's physical functional limitations as follows.[2]  (Tr. 160.)  The

claimant could not stand or walk for any amount of time in an 8-hour work day; could sit

---

[2] The ALJ found that the physician who completed this form was not identifiable
because the signature was illegible.  (Tr. 28.)  But a cover letter immediately
preceding the form in the transcript identifies the subsequent material,
including the form, as those from Dr. Mandel.  (Tr. 159.)  Also, the signature is
consistent with the signatures on other documents prepared by Dr. Mandel,
which the ALJ reviewed and identified as those from Dr. Mandel.  (*See* Tr. 775,
781-84, 789-96.)

for only 1 to 3 hours in an 8-hour work day; could lift no more than 9 pounds, and only occasionally; could not use her hands for simple grasping, pushing, pulling, and fine manipulation; and could not bend, squat, crawl, climb, push, pull; and lift above shoulder-level.  (Tr. 160.)

On July 12, 2004, Dr. Mandel reported upon physical examination that the claimant had tenderness and soreness over both elbows and both hips, but had good grip strength.  (Tr. 796.)  On November 18, 2004, Dr. Mandel reported that the claimant's "[r]heumatoid arthritis is not well controlled."  (Tr. 795.)

On April 7, 2005, state agency reviewing physician Gary W. Hinzman, M.D., performed a physical residual functional capacity ("RFC") assessment of the claimant, as follows.  (Tr. 429-36.)  The claimant could lift and carry 20 pounds occasionally and 10 pounds frequently; and sit, stand, and walk for about 6 hours in an 8-hour work day with normal breaks.  (Tr. 430.)  Her abilities to push and pull were unlimited except to the extent that she was limited in lifting and carrying.  (Tr. 430.)  She could frequently perform gross and fine manipulation; and she had no postural, visual, communicative, and environmental limitations.  (Tr. 431-33.)  On September 1, 2005, Dr. Hinzman's assessment was affirmed by another state agency reviewing physician.  (Tr. 436.)

The claimant continued to present to Dr. Mandel through November 2007.  (Tr. 784-92, 994.)  On June 9, 2005, Plaintiff continued to complain of joint pain, stiffness, and swelling.  (Tr. 792.)  Dr. Mandel reported that the claimant's "grip strength is clearly diminished," and that the claimant rated her pain at 4 on a scale to 10 in severity.  (Tr. 792.)  On July 14, 2005, Dr. Mandel assessed the claimant with rheumatoid arthritis and fibromyalgia.  (Tr. 791.)

6

On August 15, 2005, Dr. Mandel authored a medical source statement of the claimant's condition, as follows.  (Tr. 634-35.)  Plaintiff suffered rheumatoid arthritis, fibromyalgia, and depression.  (Tr. 634.)  Her symptoms began in February 2004.  (Tr. 634.)  She had tender trigger points and swollen, tender joints.  (Tr. 634.)  She could stand and walk for only 2 hours in an 8-hour work day and for 1 hour without interruption; sit for 5 hours in an 8-hour work day and for 1 hour without interruption; and lift and carry between 6 and 10 pounds frequently and between 11 and 20 pounds occasionally.  (Tr. 635.)  She was markedly limited in her abilities to handle and perform repetitive foot movements; moderately limited in her abilities to push, pull, bend, and reach; and had no limitations in her abilities to see, hear, and speak.  (Tr. 635.)

On December 2, 2005, Ashtabula County Medical Services determined that the claimant's impairments met Listing 1.02[3] for the past three years.  (Tr. 644.)

On February 9, 2006, Dr. Mandel indicated that the claimant had been participating in a "Humira study" and that the claimant had been "tolerating [the] medicine reasonably well."  (Tr. 789.)  On April 10, 2006, Dr. Mandel indicated that the claimant reported taking Humira every week and that it "has helped quite a bit," although she continued to have "some breakthrough at about day 5."  (Tr. 788.)  On July 10, 2006, Dr. Mandel indicated that Plaintiff rated her pain from 4 to 5 and 7 on a scale to 10 in severity.  (Tr. 786.)  On November 2, 2007, Dr. Mandel assessed the claimant with inflammatory arthritis and secondary fibromyalgia, although he found that the claimant had no new signs of synovitis in her wrists and that there were no tender

---

[3] Listing 1.02 regards major dysfunction of the joints due to any cause.  Listing 1.02.

trigger points present.  (Tr. 994.)

### 2.   Mental Impairments

On March 11, 2005, the claimant underwent a consultative mental examination with clinical psychologist Richard C. Halas, M.A.  (Tr. 407-10.)  Mr. Halas diagnosed the claimant with recurrent type major depression and alcohol abuse disorder.  (Tr. 409.) He found the claimant's ability to relate to others moderately limited; her ability to follow through with simple one and two step instructions intact; her ability to maintain normal levels of concentration to perform repetitive tasks intact; and her ability to withstand the stresses and pressures of day-to-day work intact.  (Tr. 410.)

On April 6, 2005, state agency reviewing psychological consultant Patricia Semmelman performed a psychiatric review technique and mental RFC assessment of the claimant.[4]  (Tr. 411-28.)  In the psychiatric review technique, Ms. Semmelman reviewed the claimant under affective disorders and substance abuse disorders and indicated that the claimant had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 415, 425.)  In the mental RFC assessment, Ms. Semmelman indicated the following.   The claimant was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 412.) There was no evidence of limitations in the claimant's abilities to be aware of normal

---

[4]  The record does not clearly indicate Ms. Semmelman's credentials.

8

hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 412.) The claimant was not otherwise significantly limited.  (Tr. 411-12.)  Ms. Semmelman concluded that the claimant was "[c]apable of simple and moderately routine work, that [she] is motivated to perform, in setting with regular expectations, occasional intermittent interactions with others and few changes."  (Tr. 413.)  On August 31, 2005, state agency reviewing psychologist Todd E. Finnerty, Psy.D., affirmed Ms. Semmelman's assessment.  (Tr. 413, 415.)

Plaintiff obtained therapy from Ms. Mary Ellen Blake, LPCC, between April 2005 and May 2006.  (Tr. 690, 716.)  On May 25, 2005, Ms. Blake authored an assessment of the claimant's mental ability to do work-related activities and indicated the following. (Tr. 606-07.)  The claimant had severe restrictions in her abilities to perform activities of daily living; perform activities within a schedule, maintain regular attendance, and be punctual; and respond to customary work pressures.  (Tr. 606-07.)  She was markedly limited in her abilities to maintain concentration and attention for extended periods of time (because of her medication); understand, remember, and carry out instructions (because of memory loss); perform complex, repetitive, or varies tasks, and behave in an emotionally stable manner.  (Tr. 606-07.)  She was moderately limited in her abilities to respond appropriately to changes in the work setting and perform simple tasks.  (Tr. 607.)  She suffered a mild deterioration of her personal habits, and she was mildly limited in her ability to respond appropriately to co-workers.  (Tr. 606-07.)  She had no limitations in her abilities to relate to others, sustain a routine without special supervision, respond appropriately to supervision, and use good judgment.  (Tr. 606-

9

07.)  Ms. Blake opined that the claimant had been so limited since December 2003 and expected the claimant's impairments to last more than 12 months.  (Tr. 607.)

On June 26, 2006, Plaintiff was voluntarily admitted to the Ashtabula County Medical Center for psychosis after experiencing visual and auditory hallucinations.  (Tr. 733.)  Dr. Khoa Tran, M.D., attended to Plaintiff and reported that Plaintiff did not have a psychiatric history, although she had been treated for depression by her family physician.  (Tr. 733.)  Dr. Tran diagnosed Plaintiff with psychosis not otherwise specified, secondary to her medical condition and medications.  (Tr. 733.)  The claimant tolerated treatment well and was discharged in stable condition on June 30, 2006, with prescriptions for Resperdal, Klonopin, and Zoloft.  (*See* Tr. 733-34.)  Dr. Tran assigned the claimant a Global Assessment of Functioning ("GAF") score of 35[5] on admission and 45[6] at discharge.  (Tr. 733.)

On July 19, 2006, the claimant presented to Dr. Tran with complaints of depression and hallucinations.  (Tr. 809.)  The claimant's mental status examination,

---

[5]  A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[6]  A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* note 6.

10

however, was normal and Dr. Tran assessed the claimant with a GAF score of 61.[7]  (Tr. 810.)  Dr. Tran continued the claimant on Risperdal and Zoloft, and increased her dosages of Klonopin and Amitriptyline.  (Tr. 810.)

On August 4, 2006, Dr. Tran diagnosed the claimant with medication-induced psychosis and depression, and ruled out bipolar disorder.  (Tr. 808.)  Dr. Tran discontinued the claimant on Risperdal, increased her dosage of Zoloft, and started her on Seroquel to help control anxiety symptoms.  (Tr. 808.)  Dr. Tran instructed the claimant to contact his office if she suffered any side effects from her medication.  (Tr. 808.)

On September 14 and 28, 2006, Dr. Tran diagnosed the claimant with bipolar disorder.  (Tr. 806, 807.)  On each occasion, Dr. Tran's mental status evaluation of the claimant was normal and Dr. Tran indicated that the claimant did not report side effects from her medications.  (Tr. 806-07.)  However, he increased the claimant's dosage of Seroquel.  (Tr. 807.)

On October 30, 2006, Dr. Tran assessed the claimant's ability to perform mental work-related activities, as follows.  (Tr. 803-04.)  The claimant was markedly impaired in relating to other people; responding to customary work pressures; and responding appropriately to changes in the work setting.  (Tr. 803.)  She was moderately impaired in performing activities of daily living; maintaining concentration and attention for

---

[7] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* note 6.

11

extended periods; sustaining a routine without special supervision; performing activities within a schedule, maintaining regular attendance, and being punctual; understanding, remembering, and carrying out instructions; responding appropriately to co-workers and supervision; performing complex, repetitive, or varies tasks; and behaving in an emotionally stable manner.  (Tr. 803-04.)  She was slightly impaired in maintaining her personal habits, using good judgment, and performing simple tasks.  (Tr. 803-04.)  The severity of the claimant's impairments existed since December 15, 2003; the claimant's limitations were expected to last for more than 12 months; and the claimant's impairments could be expected to cause the claimant to be absent from work three times a month.  (Tr. 804.)

The claimant continued to present to Dr. Tran on a monthly basis through February 2008.  (Tr. 900-08, 1110.)  Between November 2006 and May 2007, Dr. Tran indicated that the claimant reported doing well with no agitation or irritability; and Dr. Tran's observations of the claimant were unremarkable.  (Tr. 904-08.)  On May 2, 2007, Dr. Tran observed that the claimant was "tearful, sad, depressed and anxious," and indicated that the claimant reported two friends had recently passed away.  (Tr. 903.)  On May 24 and July 13, 2007, Dr. Tran again indicated that the claimant reported doing well, and Dr. Tran's observations of the claimant again were unremarkable.  (Tr. 900-02.)

On December 20, 2007, the claimant underwent a consultative mental status examination by Dr. Lilian Gonsalves, M.D., at the hospital after being admitted for worsening right patellar bursitis and acting oddly.  (Tr. 1014-18.)  Dr. Gonsalves found the claimant to be noncompliant and demanding, with tangential thoughts and slow

12

speech.  (Tr. 1017.)  Dr. Gonsalves diagnosed the claimant with bipolar affective disorder not otherwise specified; assigned the claimant a GAF score of 41 to 50; and expressed concern that the claimant was not capable of caring for herself.  (Tr. 1017-18.)

On February 28, 2008, Dr. Tran authored a letter in response to the claimant's attorney's request for an addendum to the October 30, 2006, assessment, wherein Dr. Tran affirmed his assessment in its entirety and explained that the claimant's "depression and mental problems still exist and have actually deteriorated."  (Tr. 1110.)

### C.  Hearing Testimony

#### 1.  Plaintiff's Hearing Testimony

The claimant testified at her hearing as follows.  The claimant's rheumatoid arthritis caused pain all over her body.  (Tr. 1358.)  She was not taking medication for her rheumatoid arthritis because it suppressed her immune system too much.  (Tr. 1360.)  She was diagnosed with fibromyalgia after she began the Humira study.  (Tr. 1361.)  The fibromyalgia caused her muscles to hurt.  (Tr. 1361.)  She also suffered bipolar disorder, which at times made her dislike people and unable to get along with them.  (Tr. 1362-63.)

The claimant lived with her two children.  (Tr. 1357.)  She suffered stiffness in the morning that sometimes took an hour or more to dissipate.  (Tr. 1358.)  Her pain upon waking was rated at 7 on a scale to 10 in severity.  (Tr. 1373.)  She could bathe herself after her stiffness wore off, but sometimes she required assistance from her daughter.  (Tr. 1358.)

13

The claimant's children did the laundry, although the claimant folded the laundry after it dried because the warmth of the clothing soothed her hands.  (Tr. 1357.)  The claimant could wash dishes because she used a dishwasher; and she could put most of the dishes away so long as she did not have to reach too high.  (Tr. 1357.)  She could hand-wash pots and pans by hand because immersing her hands in hot water soothed them.  (Tr. 1357.)  She could not vacuum because it hurt her elbows; but she could make beds.  (Tr. 1358.)  On some days, she was not able to carry a stack of towels. (Tr. 1351.)  She could lift a gallon of milk, but she could not carry one lest she "suffer later."  (Tr. 1351.)

The claimant could sit for five to ten minutes before she had to "substantially shift her weight."  (Tr. 1351.)  Standing relieved her discomfort, but only until her knees began to hurt, in which case she needed to sit again.  (Tr. 1351.)  She could stand for twenty minutes at a time.  (Tr. 1352.)  She could walk only thirty yards.  (Tr. 1352.)  She occasionally required a cane to walk, although she had not been medically prescribed a cane.  (Tr. 1352.)  She was able to pick up pennies or paper clips, but not for long periods of time because her hands would swell.  (Tr. 1353.)  She could not work above shoulder level because it caused her "stress."  (Tr. 1354.)  Cold and dampness exacerbate her pain.  (Tr. 1353.)

The claimant required two days of rest before she was capable of leaving her home.  (Tr. 1358.)  She had an automobile and could drive occasionally, although not for great distances.  (Tr. 1350.)  She believed she could not drive or work on a consistent basis because side effects of her medication made her drowsy and otherwise made such activity dangerous.  (Tr. 1371-72.)

14

### 2.      Vocational Expert's Hearing Testimony

The ALJ found that the claimant could not perform her past relevant work.  (Tr.

1363.)  The ALJ posed the following hypothetical to the VE:

> I want you to consider a similar claimant who could do work activity involving
> lifting no more than 10 pounds at a time and occasionally lifting or carrying
> articles like dockets, files, ledgers, and small tools.  And I want you to
> consider that she would require a sit/stand option.  In addition, I will add the
> following considerations.  The work should be fairly low stressed.  I do not
> mean no production quotas.  I just mean low production quotas.  And by
> saying that, that eliminates any high production pace.  In regards to further
> . . . limitations, there should be no high concentration of dust, fumes or
> gases; no unprotected heights; should not be around moving machinery or
> hazards; and should not be exposed to any temperature extremes, high
> humidity . . . .  In regards to postural limitations, there should be no repetitive
> work above her shoulder level.

(Tr. 1365.)  The VE testified that such a person could perform work as an order clerk

(for which there were 1,000 jobs locally and 440,000 jobs nationally); receptionist (for

which there were 1,300 jobs locally and 410,000 jobs nationally); and sorter in the

mailing house industry (for which there were 800 jobs locally and 295,000 jobs

nationally).  (Tr. 1365-66.)  Upon questioning from the claimant's attorney, the VE

testified that a person who was off task 10 minutes every hour would need an

accommodation.  (Tr. 1367.)

The VE assured that his testimony was based on the job descriptions contained

in Dictionary of Occupational Titles and its companion publication, the Selective

Characteristics of Occupations, as well as his personal knowledge and experience.  (Tr.

1345.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she

15

establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*

16

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has met the insured status requirements of the Social Security Act through 09/31/2005.

2.   The claimant has not engaged in substantial gainful activity since December 15, 2003, the alleged onset date.

3.   The claimant has the following severe impairments: rheumatoid arthritis and affective disorder.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work with the ability to lift no more than 10 pounds at a time and occasionally lift or carry articles like dockets, files, ledgers, and small tools; who would require a sit/stand option; who is limited to fairly low stress tasks, low production quotas eliminating any high production pace; with no high concentration of dust, fumes, or gases, no unprotected heights, who should not be around moving machinery or hazards and should not be exposed to temperature extremes; with no repetitive work above the shoulder level.

6.   The claimant is unable to perform any past relevant work.

. . . . .

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

17

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2003 through the date of this decision.

(Tr. 18-37.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

18

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    The ALJ's Assessment of the Claimant's Fibromyalgia

Plaintiff contends that the ALJ erroneously ignored the claimant's diagnosis of fibromyalgia and failed to find that the claimant's fibromyalgia was a severe impairment. For the following reasons, the Court finds that the ALJ did not ignore the claimant's diagnosis of fibromyalgia, and that the ALJ's failure to deem the claimant's fibromyalgia a severe impairment is, at most, harmless error and is not a basis for remand.

The determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), as the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments, or combinations of impairments, as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  However, all of a claimant's impairments, severe and not

severe, must be considered at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

Here, the ALJ found at step two that Plaintiff suffered the following severe impairments:  rheumatoid arthritis and an affective disorder.  (Tr. 11.)  The ALJ noted throughout his opinion that the claimant had been diagnosed with fibromyalgia (Tr. 19, 29, 35), but he did not explain why it was not a severe impairment; nevertheless, upon finding other severe impairments, the claimant cleared step two of the disability analysis.  *See Anthony*, 266 F. App'x at 457.  Accordingly, any defect in the ALJ's assessment of the claimant's fibromyalgia as a severe impairment would be, at most, harmless error and is not a basis for remand.  *See Anthony*, 266 F. App'x at 457 (citing *Maziars*, 837 F.2d at 244); *Pompa*, 73 F. App'x at 803.[8]

---

[8]  Plaintiff also alleges in one sentence that the ALJ "overlooked [the claimant's] diagnosis of fibromyalgia . . . at every other step of the sequential process." (Pl.'s Br. 18.)  Plaintiff does not explain how and why this is a basis for remand.  The mere diagnosis of an impairment does not indicate the severity of that impairment.  *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990) ("This court has determined that a claimant must do more to establish a disabling mental impairment than merely show the presence of a dysthymic disorder."); *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988) (explaining that signs of arthritis are not enough; the claimant must show that the condition is disabling). Nevertheless, because Plaintiff has not set forth an argument on this point, the Court need not address it further.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *accord Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (citing *McPherson*).

**C.**    **The ALJ's Assessment of Whether the Claimant's Physical Impairments Met or Medically Equaled an Impairment in the Listings**

Plaintiff contends that remand is appropriate because the ALJ erroneously failed to consider whether the claimant's severe physical impairment, rheumatoid arthritis, met or medically equaled an impairment in the Listings—particularly Listing 14.09.  For the following reasons, the Court agrees.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the impairments in the Listings.  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)).  The Listings describe impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." *Id.* (citing 20 C.F.R. § 404.1525(a)).  A claimant who meets the requirements of an impairment in the Listings will be deemed conclusively disabled and entitled to benefits. *Id.*

Each Listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." *Id.* (citing 20 C.F.R. § 404.1525(c)(3)).  A claimant must satisfy all of the criteria to "meet" the Listing. *Id.*  However, a claimant is also disabled if her impairment is the medical equivalent of a Listing, which means it is "at least equal in severity and duration to the criteria of any listed impairment." *Id.* (citing 20 C.F.R. § 416.926(a) and 20 C.F.R. § 404.1526(a)).  An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in

21

severity to any listed impairment.  *Id.* at 415; *Hunter v. Astrue*, No. 1:09-cv-2790, 2011

WL 6440762, at *3 (N.D. Ohio Dec. 20, 2011); *May v. Astrue*, No. 4:10-cv-1533, 2011

WL 3490186, at *8-9 (N.D. Ohio June 1, 2011).

Listing 14.09 regards "inflammatory arthritis" and includes rheumatoid arthritis as

an associated disorder.  Listing 14.00(D)(6)(c)(i); Listing 14.09.  To meet Listing 14.09,

a claimant's condition must be as described in Listing 14.00D6 and also meet the

following criteria:

> A.  Persistent inflammation or persistent deformity of:
>   1.  One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6); or
>   2.  One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7).
>
> or
>
> B.  Inflammation or deformity in one or more major peripheral joints with:
>   1.  Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and
>   2.  At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).
>
> or
>
> C.  Ankylosing spondylitis or other spondyloarthropathies, with:
>   1.  Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees); or
>   2.  Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.
>
> or

D.  Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1.  Limitation of activities of daily living.
2.  Limitation in maintaining social functioning.
3.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

Listing 14.09.

Here, the ALJ concluded that the claimant did not have an impairment or combination of impairments that met or medically equaled an impairment in the Listings, but devoted his four-page assessment of the claimant's severe impairments exclusively to the claimant's severe mental impairment—her affective disorder under Listing 12.04.  (Tr. 24-27.)  The ALJ never mentioned anywhere in his opinion which Listing related to the claimant's rheumatoid arthritis and provided no analysis of whether the claimant's rheumatoid arthritis met or medically equaled an impairment in the Listings, including Listing 14.09.

The Commissioner argues that any error in failing to address the claimant's rheumatoid arthritis under Listing 14.09 was harmless because the ALJ discussed evidence in his opinion that supports the conclusion that the claimant's rheumatoid arthritis did not meet or medically equal the Listing.  The Commissioner cites *Rabbers v. Commissioner of Social Security*, 582 F.3d 647, 657-58 (6th Cir. 2009), in support.  For the following reasons, *Rabbers* is distinguishable and inapposite.

In *Rabbers*, the ALJ found the claimant's bipolar disorder constituted a severe impairment but did not meet or medically equal Listing 12.04 regarding affective disorders.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009).  The

23

ALJ expressly evaluated the claimant's bipolar disorder under Listing 12.04 and explained that the impairment did not meet or medically equal the Listing because it did not meet the Listing's "A" criteria.  *Id.*  The ALJ did not, however, explain how the impairment failed to meet the Listing's "B" criteria.[9]  *Id.*  The Sixth Circuit held that although the ALJ's failure to discuss the "B" criteria was error, it was harmless error because there was insufficient evidence that any of the "B" criteria were met, so any additional analysis by the ALJ would not have changed his findings under the Listings. *Id.* at 658-61.

Here, unlike in *Rabbers*, the ALJ utterly failed to analyze the claimant's rheumatoid arthritis under the Listings.  This case is more analogous to *Reynolds v. Commissioner of Social Security*, wherein the ALJ also found that the claimant suffered both a severe mental impairment and a severe physical impairment, analyzed the severe mental impairment, concluded the claimant's impairments did not meet or medically equal an impairment in the Listings, and utterly failed to analyze whether the claimant's severe physical impairment met or medically equaled an impairment in the Listings.  *See Reynolds*, 424 F. App'x at 415-16.  The Sixth Circuit found the ALJ's error prejudicial and explained that "the ALJ needed to actually evaluate the evidence, compare it to . . . the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review," because "[w]ithout it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence."  *Id.* at 416.

_____

[9]  For a claimant's impairment or combination of impairments to meet or medically equal Listing 12.04, the claimant's impairments must be of the same level of severity as that described in either the Listing's "A" and "B" criteria, or the Listing's "C" criteria.  *See* Listing 12.04.

Put simply, the Court is unable to conduct a meaningful review of the ALJ's Step Three analysis of the claimant's rheumatoid arthritis because the ALJ skipped the entire step.  *See* *Reynolds*, 424 F. App'x at 416; *Hunter*, 2011 WL 6440762, at *4; *May*, 2011 WL 3490186, at *9.  This was harmful error because if a person is found to meet an impairment in the Listings, they are disabled within the meaning of the regulations and are entitled to benefits without further analysis.  *Reynolds*, 424 F. App'x at 416 (citing 20 C.F.R. § 404.1520(a)(4)(iii)); *May*, 2011 WL 3490186, at *9.  Therefore, if the ALJ had properly analyzed whether the claimant's severe rheumatoid arthritis met Listing 14.09 and determined it met or medically equaled Listing 14.09, the claimant would have been entitled to benefits.  *See* *Reynolds*, 424 F. App'x at 416 (citing 20 C.F.R. § 404.1520(a)(4)(iii)); *May*, 2011 WL 3490186, at *9.  To the extent that the Commissioner argues that evidence otherwise supports the conclusion that the claimant's rheumatoid arthritis did not meet or medically equal Listing 14.09, such *post hoc* rationale is not persuasive, as the ALJ's rationale is under consideration, not defense counsel's.  *See* *Hunter*, 2011 WL 6440762, at *4; *May*, 2011 WL 3490186, at *9; *S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

In short, remand is appropriate so that the ALJ may properly analyze the claimant's severe rheumatoid arthritis under the Listings and provide a basis upon which one could perform a meaningful review of the Step Three determination.

### D.    The ALJ's Assessment of the Claimant's Treating Sources

Plaintiff contends that the ALJ failed to assess the opinions of the claimant's treating sources properly.  For the following reasons, the Court agrees.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating source's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (1996)).

Plaintiff contends that Dr. Mandel and Dr. Tran are the claimant's treating sources, and that the ALJ failed to discuss the weight he gave to their opinions and the reasons for that weight.  The ALJ discussed some evidence from Dr. Mandel and Dr. Tran in a seven-page recitation of the evidence and then "evaluat[ed] the physicians' conclusions" as follows:

> The Administrative Law Judge has considered 20 CFR 404.1527 and 20 CFR 416.927 in evaluating the physicians' conclusions and finds that such conclusions are not supported by the evidence of record. County Medical Services Disability Determination from Ashtabula County felt that the

26

claimant equaled 1.02 May 1, 2005 (Exhibit 27F).  A physician whose name is illegible in apparently July 2004 stated that in an 8 hour work day, the claimant was unable to stand/walk and was limited to sitting 3 hours.  It was suggested that the claimant would be limited to lifting less than 10 pounds (Exhibit 3F).  It was noted that she had a flare of inflammatory arthritis. Kathy Eichas, PA-C, in August 2005 diagnosed RA, fibromyalgia, and depression and indicated that the claimant could stand/walk 2 hours in an 8 hour workday and sit 5 hours in an 8 hour work day (Exhibit 24F).

(Tr. 35.)  The ALJ's analysis is devoted wholly to the claimant's physical impairments. Further, the physician whose name the ALJ believed was illegible, and who stated that the claimant could not stand or walk in an 8-hour work day and could sit for only 3 hours, is Dr. Mandel.

As an initial matter, the Commissioner argues that any failure to give good reasons in relation to Dr. Mandel's and Dr. Tran's opinions was not error because Dr. Mandel and Dr. Tran were not treating sources when they authored their opinions that the claimant was significantly impaired (namely, Dr. Mandel's assessment from July 2004, and Dr. Tran's assessment and letter from October 2006 and February 2008, respectively).  For the following reasons, the Court disagrees.

A treating source is a claimant's physician, psychologist, or other acceptable medical source who provides the claimant, or has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) (quoting 20 C.F.R. § 404.1502).  Generally, one visit with a physician is not enough to establish an ongoing treatment relationship.  *See, e.g.*, *Kornecky,* 167 F.App'x at 506-507 (noting that "a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship," and that, "depending on the

27

circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 491 (6th Cir. 2005) (finding that a physician who saw the claimant two times for his back pain did not qualify as a treating source).

The Commissioner contends that the claimant presented to Dr. Mandel only two times before Dr. Mandel authored his July 2004 assessment. However, the claimant sought treatment from Dr. Mandel at least four times; Dr. Mandel performed a full physical evaluation of the claimant and diagnosed the claimant with arthritis; and Dr. Mandel not only prescribed the claimant medication but also managed the claimant's medication. The claimant presented to Dr. Tran five times before Dr. Tran authored his October 2006 assessment, and Dr. Tran evaluated the claimant's mental condition and managed her medication. The Court is satisfied, based on the record evidence and the absence of persuasive legal authority to the contrary, that Dr. Mandel and Dr. Tran were the claimant's treating physicians when they authored their assessments. *Cf. Daniels v. Apfel*, 242 F.3d 388 (Table), 2000 WL 1761087, at *2 (10th Cir. Nov. 29, 2000) (finding that "it is doubtful" the appellant's physician was a treating source because "[a]lthough the assessment forms he signed indicate that he diagnosed appellant and prescribed medication for him, *there is no evidence [he] provided ongoing care*" (emphasis added)).

The ALJ's analysis of the claimant's treating sources is not sufficiently specific to make clear the weight he gave their opinions and the reasons for that weight because it is broadly conclusory; it does not explain which opinions are unsupported and how they

28

are inconsistent with the record evidence; and it is inherently contradictory.[10]

When an ALJ fails to give good reasons for according less than controlling weight to a treating source, reversal and remand might remain unwarranted if the error is a harmless, *de minimis* procedural violation.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (citing *Wilson*, 378 F.3d at 547).  Such harmless error may include instances where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," or where the Commissioner "has met the goal of . . . the procedural safeguard of reasons."  *Id.* (quoting *Wilson*, 378 F.3d at 547).  However, the ALJ's failure to follow the Agency's procedural rule does not qualify as harmless error when the court cannot engage in meaningful review of the ALJ's decision.  *Id.* (quoting *Wilson*, 378 F.3d at 544).  Such is the case here.  The ALJ's analysis essentially amounts to a recitation of evidence and a broad conclusion that unidentified physicians' opinions are unsupported, without any explanation or logical nexus between his determination and the reasons for it.  Remand is appropriate for the ALJ to assess the claimant's treating sources clearly and sufficiently for meaningful review.

----

[10] The ALJ appears to find that Dr. Mandel's opinion of the claimant's abilities to sit, stand, and walk are unsupported, as he did not incorporate such limitations in his RFC determination; however, the ALJ cites evidence that *supports* Dr. Mandel's conclusions—the County Medical Services Disability Determination from Ashtabula County indicating that the claimant's impairments met or medically equaled Listing 1.02.  In addition, the ALJ substantially agreed with Dr. Mandel's conclusion the claimant could lift only less than 10 pounds, as he determined that the claimant could lift almost the same weight—no more than 10 pounds.  The Court also is unable to review the weight the ALJ attributed to Ms. Eichas's opinions because the ALJ provided no analysis of it.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be REVERSED and this case REMANDED for further

proceedings consistent with this Report and Recommendation.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  January 19, 2012

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of this notice.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**

30